## No. 2774.

## Rainey Browning v. The State.

1. **Practice—Continuance—New Trial.**—Under the statutory rules of practice in this State, an accused, whose application for continuance has been refused, and who has been convicted, is entitled to a new trial as a matter of right when, in the light of the evidence adduced upon the trial, the absent testimony set out in the application for continuance is material to the defense, and is probably true. Unless such absent testimony, if probably true, would, if procured, tend to disprove the guilt of the accused, it would be too immaterial to authorize a new trial because of the refusal of the continuance.

2. **Same—Practice in the Court of Appeals.**—This court will not revise the action of the trial court in refusing a new trial because of its previous refusal of a continuance unless it be made to appear, not merely that the accused might probably have been prejudiced by such ruling, but that it is reasonably probable that, had the absent testimony been before the jury, a verdict more favorable to the defendant would have resulted. See the opinion for the substance of absent testimony set forth in the application for continuance and *held* as to one witness to be immaterial, and as to the other not probably true; wherefore the trial court did not err in refusing a new trial.

3. **Murder—Fact Case.**—See the statement of the case for evidence *held* sufficient to support a conviction for murder in the first degree.

Appeal from the District Court of Marion. Tried below before the Hon. W. P. McLean.

The conviction in this case was in the first degree for the murder of Lewis Rucker, in Marion county, Texas, on the tenth day of June, 1888. A life term in the penitentiary was the penalty assessed against the appellant.

Constable G. W. Terry (white) was the first witness for the State. He testified that, on the morning of June 10, 1888, he was sent for and went to the house of Bowie Browning, in Marion county, to investigate the killing of Lewis Rucker. He found the dead body of the said Rucker lying on the road side, about two hundred yards distant from the said Bowie Browning's house. He at once made an examination of the dead body and of the surroundings, which said examination disclosed that the said Lewis Rucker had been recently killed by gun shots. Two buckshot had entered Rucker's left breast, immediately over the heart, and two other buckshot had penetrated the left arm. Six other buckshot had entered the rails of a fence opposite and near the point in the road where the dead body lay. Some persons present at the time found on the ground some fragments of old rags or tow, which, being powder burned, had the appearance of having been recently fired as wadding from a gun. The witness was positive that the gun wadding described was old, torn rags or tow, and not cotton. Quite a number of people, the witness could not satisfactorily estimate the number, were on the ground and about the body when he arrived, which was about nine o'clock in the morning. At about three o'clock on that afternoon the witness arrested the defendant in his house as the party who had fired the fatal shot. At the time of the arrest the witness found a double barreled shot gun in the said house. The right hand barrel of that gun was loaded, but it had been recently discharged. The witness was positive that the said barrel of the gun had been recently discharged. He discovered that fact by a critical examination of the same, which resulted in finding fresh signs of powder burn at the muzzle. The left hand barrel was loaded, and its condition showed that it had not been discharged for a considerable time. The cap on the tube of the said left hand barrel had, however, been recently exploded, the signs of such explosion around the base of the tube being fresh and distinct. The witness was a fire arm expert, and had had much experience with guns. The witness unloaded the gun he found at the defendant's house, and found it to contain charges of buckshot similar to the shot found in the fence rails. He did not extract any of the shot from the said rails, but saw several that were only partially imbedded, and easily determined their size. Wadding of old rags was found in the gun.

Cross examined, the witness testified that a pistol was found on the body of the deceased. It was taken from one of the pockets of the pantaloons. It was a five shooter, three of the chambers being loaded, and the others empty. Neither of the said empty chambers had been recently discharged. The witness did not find the rag wadding himself, but was present and saw some of the parties about the body pick it up from the ground. He afterwards saw it at the coroner's inquest. The witness was unable to say why the gun found at the defendant's house, the buckshot and the wadding described, were not present upon this trial.

Lewis Taylor (colored) testified, for the State, that he lived in Marion county, Texas, about two miles distant from the house of the defendant. He knew the defendant, and was acquainted with the deceased prior to his death, which occurred on the morning of Sunday, June 10, 1888. The witness saw the dead body of Lewis Rucker about nine o'clock on the said morning. About one or two hours by sun on that morning the defendant, riding his mule, stopped at the gate of Mary Browning's house, where the witness was living, and called the witness. Witness went into the yard and stopped at a point near the gate, and from that point exchanged a few words with the defendant, who sat on his mule on the opposite side of the gate. Defendant asked witness if he knew where Sarah Carter was, to which question the witness replied that he did not. About that time Frances Rucker, the sister of the deceased, came running towards the gate. She was weeping, and very much excited. The defendant started to ride off, when Frances hallooed to him: "You have killed my brother Lewis, and you must not run off, for I will have you brought back!" Defendant made no reply to Frances, but rode off in a pace. Frances Rucker was not more than fifty steps, if that, from the defendant when she hallooed to him as stated. Witness supposed that the defendant heard what the said Frances said to him, as she spoke in a loud tone of voice, and was quite as near the defendant as she was to him, witness, and he heard her plainly. As the defendant rode off, the witness asked him where he was going, and he replied that he did not know. Witness could assign no reason for asking that question of defendant. Mary Browning, the sister of the defendant, owned the place at which the witness lived. She was in the house while the defendant was at the gate. She did not go to the gate during

that time, nor did the defendant see or speak to her.   The defendant was a white man, and Sarah Carter, the woman for whom he inquired of the witness, was a negress.   She and the defendant lived together, and had five children.   The witness was a negro.   Mary Browning, the sister of defendant, on whose place the witness lived, was a white woman.   The State at this point asked the witness if he and Mary Browning did not live together, and occupy the same room, but the defense objecting, the witness was not permitted to answer the question.   There were several houses on Mary Browning's place, and the witness occupied one of them.   Frances Rucker (colored) lived in the house with Bowie Browning, the brother of the defendant.

Frances Rucker (colored), the sister of the deceased, testified for the State, that the deceased was killed about sunrise on the morning of June 10, 1888.   The witness, who lived with Bowie Browning, was getting breakfast when the fatal shot was fired. She heard the report of the gun, which was fired at a short distance from the house, and almost immediately after the discharge she heard from the same direction the explosion of a gun cap—the gun failing to fire the second time.   A few minutes after the report of the gun and the explosion of the cap, Bowie Browning came into the cook room from the cow pen, where he had been milking, and told the witness that her brother, who had gone to drive up some calves, had been shot down in the road.   Witness ran to the place indicated by Bowie, and found her brother lying on the ground, his feet in the road, and his body beyond it.   She saw that he was dead, and did not go immediately to the body, but ran at once to the houses. of Mr. Chism, Mr. Chapman and other neighbors, to report the assassination.   She then went on to the house of Lewis Taylor. (Mary Browning's.)   Just before reaching that house she saw the defendant, on his mule, at the gate, talking to Lewis Taylor, who was just inside of the gate.   As soon as the defendant caught sight of the witness, he started to ride off, and witness hallooed to him: "You have killed my brother, Lewis. You need not run away, for I will have you brought back." Defendant looked over his shoulder at witness, but made no reply, and rode off, whipping his mule violently in order to make it run, but succeeding only in urging it to a pace.   At the time the witness hallooed at the defendant and charged him with the murder of her brother, Lewis Taylor was standing at

the gate, and Joe Crisp was in the yard, walking towards the gate. The distance between Bowie Browning's house, near which the deceased was killed, and the defendant's house was about half a mile.

On Saturday, two weeks before the killing of the deceased, the defendant and Sarah Carter, and Jennie Carter, the sister of Sarah, were at Bowie Browning's house, at which time, in the presence of the parties named and the witness, the defendant charged Sarah Carter of carnal indulgences with the deceased; saying that Mat Browning, the eleven year old son of Sarah Carter by another man than defendant, told him, defendant, that he, Mat, saw her and deceased in the act. In that same conversation, the defendant said to Sarah Carter: "If you ever leave me, I will kill Lewis Rucker." Sarah Carter denied positively that she had ever been guilty of a carnal act with the deceased, and sent for her son Mat, who denied that he had ever told the defendant that he detected the deceased and the said Sarah in the carnal act. The defendant and the deceased then talked the matter over for awhile at the house. They then went together to the smoke house, talked awhile, and came back apparently on friendly terms, which they maintained until the following Saturday, which was the day before the assassination. During the said week the defendant and deceased visited each other on friendly terms, and the defendant shaved the deceased. On Saturday, June 9, 1888, the day before the fatal Sunday, Jennie Carter, who lived with her sister and the defendant, went with witness to a small creek near the defendant's house, to catch some fish. Deceased and Jim Jordan, hunting squirrels, came to where witness and Jennie were fishing, remained a short while, and went off. Witness and Jennie returned to the defendant's house about sun down, and soon afterwards the witness heard the defendant say to Sarah Carter: "I have caught you and Lewis Rucker. I found your bed out in the woods, made of pine tops, and saw where you lay together." Thereupon, Jennie, speaking to the defendant, said: "You are mistaken about Sarah. It was not her." Sarah then said to the defendant: "I am tired of you accusing me of Lewis Rucker." Defendent replied: "It was either you or Jennie, and I intend to put a stop to Lewis Rucker." Witness left soon afterwards and went home, to the house of Bowie Browning. Deceased was killed on the following morning. Deceased, at that time, had been living at Bowie Browning's

house about nine months, and was in the habit of going after and driving up the calves every morning, and usually went in the same direction, and it was in that direction from home that he was killed.

Jennie Carter (colored), the sister of Sarah Carter, was the next witness for the State. She testified that, at the time of the assassination of Lewis Rucker, she had been living at the house of the defendant and her said sister a little more than a year. Defendant and Sarah occupied the same room and bed, and had one dead and five living children. The witness and Frances Rucker went to the creek near defendant's house, fishing, on the day before the assassination, and while there were joined for a short while by the deceased and Jim Jordan, who were squirrel hunting. Witness and Frances went back to defendant's house late in the evening, and shortly after they got back the defendant, in the presence and hearing of witness, told Sarah Carter that he had caught her, and that he had found a bed of pine tops in the woods where she and deceased had been. Witness then told defendant that he was mistaken about Sarah. Defendant then said that it was either Sarah or the witness who had occupied that bed with deceased, and that he intended to put a stop to it. He did not say then that he intended to put a stop to deceased. Sarah Carter then told defendant that she was tired of being accused by him of the deceased, and would not submit to it. Frances soon left to go home, and defendant left the place to drive up his horses, and while he was gone after his horses Sarah Carter left the place, saying that she was going to the house of a colored man named Weatherall. When defendant returned and missed Sarah he asked witness where she was, and witness told him that she had gone. After supper the defendant saddled his horse, and said that he was going off to hunt for Sarah, and witness told him that he would find her at Weatherall's. Defendant returned between twelve and one o'clock on that night, and reported that Sarah was not at Weatherall's, and that he had failed to find her. Defendant appeared to be much troubled, and witness told him to go to bed, and that she would find Sarah next morning and bring her back. Defendant then went to his room and lay down across his bed, without putting off his clothes. Before day light on the next morning witness awakened Mat Browning, who, with the other children, was sleeping in her room, and sent him to the lot to saddle a horse for her. Witness left

defendant's house about day light to go to Weatherall's after
Sarah. She had just reached Weatherall's house, a mile or a
mile and a half distant from defendant's house, when she heard
the report of a gun fired in the vicinity of Bowie Browning's
place. The defendant was lying across his bed with his clothes
on and was not asleep when, just before starting to Weatherall's
on the fatal morning, witness looked into his room. Witness
got back to defendant's house with Sarah about nine or ten
o'clock on that morning, and found the defendant standing on
his gallery. Witness saw the dead body of Lewis Rucker be-
tween ten and eleven o'clock on that morning.

Cross examined, the witness said that she heard the quarrel
at Bowie Browning's house on the second Saturday before the
killing. On that occasion the defendant accused Sarah and the
deceased of maintaining carnal relations with each other,
which charge was denied by both Sarah and deceased. Sarah
then sent for her son Mat, who denied that he ever told defend-
ant that he detected his mother and deceased in the carnal act.
Deceased and defendant then settled their dispute, and visited
each other on friendly terms until the day before the homicide.

Joe Crisp (colored) testified that he lived at Mary Browning's
place—the same place where Lewis Taylor lived. He saw the
defendant and Lewis Taylor at the gate at Mary Browning's
yard, talking to each other, early on the morning of the fatal
day. When defendant first came to the gate the witness was
in the horse lot. The witness went towards the parties at the
gate by walking around the house. As he approached the
gate from the horse lot he heard Frances Rucker, coming up the
road, crying and raving. As she approached the gate, where
defendant and Taylor still were—defendant on his mule outside
of the gate, about three steps distant from Taylor, who was
standing just inside the gate—she said to defendant, in a loud
voice: "You killed my brother, and need not run off, for I
will bring you back." Defendant rode off at once. If he looked
back the witness did not observe it. Frances was about
seventy-five yards distant from witness when he saw her, and
about the same distance from the defendant. Witness heard
distinctly what she said to defendant. Defendant rode off in a
pace, whipping his mule. While he was at the said gate, the
defendant told his sister, Mary Browning, who was then in the
yard, to take care of his children, as he was going off. He gave
that direction to his sister before Frances Rucker spoke to him.

Mat Browning (colored) testified, for the State, that he was eleven years old, had attended school and could read and write. He was the son of Sarah Carter, and lived with her and defendant. Witness, about day light on the morning of the killing, saddled a horse at defendant's place, which Jennie Carter rode off in search of Sarah Carter. At about sun rise the defendant came into the room then occupied by his children, kissed them all, and told them good bye. No person was at the defendant's house after Jennie left, except the defendant and the children.

J. M. DeWare, sheriff of Marion county, Texas, testified, for the State, that he went to and examined the place of the tragedy on the day after it occurred. He found a great many tracks about that place, but became satisfied that the party who fired the fatal shot fired it from behind a fallen log, twenty-three steps from the place where the deceased fell. The tops of bushes between the fallen log and the point in the road where the deceased fell had been cut by bullets or shot. On the tops of bushes, on the line between the two said points, the witness saw small pieces of lint cotton, which, being powder stained, appeared to have been fired from a gun. He saw no rag wadding on the ground or elsewhere. From the point where the killing took place to the defendant's house, by way of the main road, was between a half and three quarters of a mile. The shot found in the fence was buried in the wood to the depth of from a quarter to a half an inch. Witness saw some of the shot which were said to have been cut from the fence. They were low mould buck shot.

The State closed.

William Chism (white) was the first witness for the defense. He testified that he knew the deceased for the seventeen or eighteen years preceding his death. Deceased was raised in the neighborhood in which he was killed, and lived there always except the year or two that he was absent from the county. Frances Rucker, the sister of the deceased, came to the house of the witness early on the morning of June 10, 1888, and told the witness that her brother Lewis had been killed, and that his body was lying at a certain point in the road. Witness and Chapman then went to a point indicated by Frances, and were the first persons to reach the body of the deceased. The witness found a piece or two of lint cotton wadding that had been recently fired from a gun, but saw no rag or tow wad-

ding near or about the place of the killing. The wadding of lint cotton found by the witness was the only wadding that was in evidence before the jury at the inquest upon the body. The body of the deceased, when witness saw it on that morning, was lying on the side of the road about two hundred yards from Bowie Browning's house. The shots that struck the fence buried themselves in the wood. The witness dug one of them out and found it to be a buckshot. It was flattened just as any other leaden missile fired against hard wood would be. Witness was present and saw G. W. Terry unload the defendant's gun. Both barrels were loaded, and the wadding of each was of rags. One of the loads had been in the gun for some time, but one of the barrels had been recently discharged. The witness could not tell what length of time had elapsed since the discharge of a load from that barrel, but not longer than two, three or four days, which was as near as anybody could estimate, by signs on a gun, the time that had elapsed since its discharge. A five shooter pistol, three chambers loaded and two empty, was found in a pocket of the deceased's pants. It was in some manner caught or fastened in the pocket, and was removed with much difficulty, and only after efforts made separately by witness, Mr. Mimms and Doctor Dargan.

Jim Jordan (colored) testified, for the defense, that he was a nephew of the deceased. The deceased never in his life time told witness that he he had killed a man while working on the railroad, and that he was on a constant lookout for danger. This witness denied that he ever told Mr. Camp and Mr. Armistead, in the presence of Sheriff DeWare, that deceased had ever made any such statement to him.

Sheriff DeWare testified, for the defense, that, during this trial, Messrs. Camp and Armistead, attorneys for the defendant, by leave of the court, had an interview with the witness Jim Jordan, in the presence and hearing of the witness. In the course of that interview the said Jim Jordan told the said Camp and Armistead that the deceased, before his death, told him that he had killed a man and was on a constant lookout for trouble, and for that reason always carried arms.

Bowie Browning, the brother of the defendant, testified, in his behalf, that, at the time of the killing, the deceased had lived at his, witness's, house and in the employ of the witness, about nine months. According to his statement, he came to

witness's house from a point on the railroad where he had been at work.    He told the witness that he had killed a man in a fight, with a spade, and that he was afraid the dead man's relatives would hunt him down and kill him.    He carried a pistol at all times, and sometimes a double barreled shot gun.    Witness was in his cow pen milking when the fatal shot was fired. He then went near enough to the point of the shooting to see the body of deceased lying in the road, and then he went to the house and told Francès that her brother had been shot.  He did not go to the body until Chism and Chapman reached it.

Cross examined, the witness said that he had known the deceased since his, deceased's, boyhood.    Except the short time he was away working on the railroad, the deceased had lived always in the neighborhood in which he was killed.    The deceased did not tell witness the name of the man he had killed, nor whether that man was white or black.    He said that the killing took place on the railroad near Texarkana.    The witness never heard of that killing except from the deceased, and he had never heard of any man being killed on the railroad near Texarkana, by being struck over the head with a spade. Deceased was in the habit of going after the calves early in the morning, and of driving them to the house over the road on which he was killed—a fact known to the defendant.

The opinion sets out the substance of the absent testimony upon which the application for continuance was based.

*W. T. Armistead, J. H. Culberson* and *Camp & Taylor*, for the appellant.

*W. L. Davidson*, Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE.    In our opinion, the only question necessary to be considered upon this appeal is the correctness of the action of the lower court in reference to defendant's application for a continuance.    The statutory rule is "that, should an application for continuance be overruled and the defendant convicted, if it appear upon the trial that the evidence of the witness or witnesses named in the application was of a material character, and that the facts set forth in said application were probably true, a new trial should be granted." (Code Crim. Proc., art. 560, subd. 6.)    When considered, however, in the light of the evidence adduced on the trial, before such

new trial can be claimed as a matter of right by a defendant, it must appear that the absent testimony is both material and probably true.

Buff Collier and Mary Browning were the two absent witnesses for whom the continuance was sought. By Buff Collier it is stated that it was expected to be proven that said witness was at the house of defendant at the time deceased was shot, and "that he, the witness, heard the gun fire; and at the very time of the firing of the fatal shot (as will be shown by the State) that this defendant was at home and in conversation with said witness at the precise time of the killing." There can be no question of the materiality, but is such testimony probably true? Mat Browning, a boy eleven years old and who lived with defendant, and who was left by Jennie Carter at the house with defendant, swears that "there was nobody at the house after Jennie Carter left, except defendant and the children." Besides this, Buff Collier is not seen on or about the premises of defendant, nor on or about the scene of the homicide that morning, by any of the witnesses who testified, and quite a number of persons were at the body shortly after the homicide. It was lying in the public road, and it is hardly probable that Buff Collier should have been at defendant's house at the time of the killing and not afterwards been seen by some one at or about the dead body.

By the other witness, Mary Browning, defendant expected to contradict and disprove the evidence of Joe Crisp, a State's witness, who testified in substance that he (witness) was at Lewis Taylor's on the morning of the homicide—saw defendant there, and heard defendant tell "his sister, Mary Browning, whilst he was at the gate, to take care of his (defendant's) children—that he was going off." This was but a short time after the killing. It was stated in effect that Mary Browning would testify positively that no such conversation occurred.

On the trial Lewis Taylor, a State's witness, contradicted this portion of Crisp's testimony, for he testified that Mary Browning "was in the house whilst the defendant was at the gate, and did not come out, and defendant did not speak to her." This portion of Crisp's testimony was only material as a circumstance tending to show that defendant, immediately after the homicide, was contemplating flight. Suppose that upon this point the witness Crisp was mistaken, or that he wilfully lied, then, in the light of the other evidence in the case, is it at

all material whether the defendant had such a conversation with his sister or not? Witnesses for the State proved that defendant did not flee, that he was arrested at his own house the afternoon of the killing. If Mary Browning should disprove Crisp's testimony as to the matter, would that fact disprove the other inculpatory facts which are uncontradicted and which point with unerring certainty to the defendant's guilt? We think not.

The rule is well settled that testimony which, if procured,. would not tend to disprove the guilt of the accused is of too immaterial a nature to entitle him to a new trial based upon an application for a continuance to obtain it. (Fernandez v. The State, 4 Texas Ct. App., 419; Chaplin v. The State, 7 Texas Ct. App., 87; Frye v. The State, Id., 94; Hildreth v. The State, 19 Texas Ct. App., 196; Burton v. The State, 21 Texas, 337.)

In view of the fact that the State's witness, Lewis Taylor, positively contradicted the statement made by Crisp as to the conversation between defendant and his sister, Mary Browning, and the further fact that it was proven that defendant did not flee or attempt to flee the country, we can not perceive how Mary Browning's proposed testimony becomes material or could in any manner have affected the result of the trial. "It is not in every case, however (even), where the absent testimony is material and probably true that this court will revise the ruling of the trial judge (in refusing a new trial considered with reference to the application for a continuance). It is only in a case where, from the evidence adduced upon the trial, we would be impressed with the conviction not merely that the defendant might probably have been prejudiced in his right by such ruling, but that it was reasonably probable that, if the absent testimony had been before the jury, a verdict more favorable to the defendant would have resulted." (Covey v. The State, 23 Texas Ct. App., 388; Willison v. The State, 7 Texas Ct. App., 400.)

An examination of the evidence adduced on the trial, and especially the uncontroverted inculpatory facts proven, will, in our opinion, show that the facts expected to be established by Mary Browning are wholly immaterial in this case, and, whether true or false, do not tend to disprove defendant's guilt,. as shown by the evidence; and if they had been before the jury would not likely or probably have affected the result of the verdict.

---

---

Appellant, who was a white man, had for several years been living and cohabiting with a negro woman, by whom he had had several children. He had become inordinately jealous of the relations he believed were existing between this woman and deceased, who was a negro. He told her if she ever left him he would kill Rucker, the deceased. He had more than once charged the parties with criminal intercourse, but they had denied the imputation, and in a manner allayed his suspicions, until the very day before the homicide, when certain supposed discoveries, made by him out in the woods, again filled him with jealous rage, and upon his returning to his house in the evening, he again charges the woman with her infidelity. She becomes enraged, tells him she will no longer submit to such conduct, and indignantly leaves his house. He hunts for her that night in the neighborhood, but can not find her. At day light in the morning he is seen lying across his bed, awake, with his clothes on, by the woman's sister, who proposes that she will go and hunt her sister and bring her back. She leaves on that mission about sun up. Defendant goes into the room where his children are and kisses them good bye. Shortly after sun rise, Rucker, the deceased, who lives half a mile away, is shot and killed in the road whilst driving up the calves, and where defendant knew he was in the habit of going every morning. A report of a gun is heard, and one witness also hears a sound as if another cap had been bursted. A short time afterwards defendant appears at Lewis Taylor's, making inquiries for his woman. Whilst he is sitting upon his mule at the gate, a sister of the deceased, who had seen the dead body of her brother, came hurrying up with cries and lamentations. Defendant sees her and starts to go. She charges him with the murder; those standing by heard the charge; he must have heard it. Yet he does not deny—does not say one word in answer to the charge, but rides hurriedly away. His silence and conduct are an admission of the truth of the accusation. (Whart. Crim. Ev., 8 ed., sec. 680; Tyler v. The State, 11 Texas Ct. App., 388.)

This is not all. Afterwards, on the same day, in defendant's house, a double barreled shot gun is found, one barrel of which has evidently been recently discharged, and the cap upon the tube of the other barrel has recently been exploded without discharging the load. There is a conflict between the witnesses, it is true, as to the kind of gun wadding found on the ground

at the place of the killing; this, however, is unimportant, in the light of the other undisputed facts.

It was also attempted to be proven that other parties might have had a motive for taking the life of deceased, by proving that deceased himself had stated to Bowie Browning, defendant's brother, that he, deceased, had killed a man with a spade whilst he was working on the railroad near Texarkana, and that he was afraid the dead man's relatives would hunt him down and kill him. And it was further proven that deceased constantly carried a pistol, and one was found upon the dead body, fastened in the pants pocket so that it required an effort to get it out. But no strangers are seen by anyone, lurking about the premises or neighborhood on that day, or at any other time.

Though circumstantial, in our opinion the evidence is conclusive of defendant's guilt, and, in the light of such evidence, we can not see how it is possible that Mary Browning's testimony, that her brother, the defendant, did not tell her that he was going away, and that she must take care of his children, is in any wise material, or could in any reasonable manner probably affect the result of the trial.

There are no other questions presented in the record which it is deemed necessary to discuss. There being no reversible error on this appeal, the judgment is in all things affirmed.

*Affirmed.*